# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | |
|---|---|
| Hiram Patterson, Texas Division, Sons of Confederate Veterans, Inc., Plaintiffs, <br><br> v. <br><br> Mike Rawlings, In His Official Capacity as Mayor of the City of Dallas, and Scott Griggs, Adam Medrano, Casey Thomas, II, Dwaine Caraway, Rickey Callahan, Omar Narvaez, Kevin Felder, Tennell Atkins, Mark Clayton, Adam McGough, Lee Kleinman, Sandy Greyson, Jennifer Gates, Philip Kingston, In Their Official Capacities as Members of the Dallas City Council, Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § Civil Action No. 3:17-CV-02361-D <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

## PLAINTIFFS' SECOND AMENDED COMPLAINT, APPLICATION FOR INJUNCTIVE RELIEF, & MOTION FOR DECLARATORY JUDGMENT

### A. PARTIES

1.     Plaintiff, Hiram Patterson, is a citizen of the State of Texas, a resident taxpayer of Dallas, and a descendant of Confederate veterans.

2.     Plaintiff, Texas Division, Sons of Confederate Veterans, Inc., is a non-profit corporation that is organized under the laws of the State of Texas.

3.     Defendant, Mike Rawlings, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the Mayor. *See* Fed. R. Civ. P. 4(j)(2)(A).

4.     Defendant, Scott Griggs, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

5.     Defendant, Adam Medrano, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

6.     Defendant, Casey Thomas, is an officer of the City of Dallas and is being sued in his official capacity. She may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

7.     Defendant, Dwaine Caraway, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

8.     Defendant, Ricky Callahan, is an officer of the City of Dallas and is being sued in his official capacity. She may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

9.     Defendant, Omar Narvaez, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

10.     Defendant, Kevin Felder, is an officer of the City of Dallas and is being sued in his official capacity. She may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

11.     Defendant, Manny Pelaez, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

12.     Defendant, Tennell Atkins, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

13.     Defendant, Mark Clayton, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

14.     Defendant, Adam McGough, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

15.     Defendant, Lee Kleinman, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

16.     Defendant, Sandy Greyson, is an officer of the City of Dallas and is being sued in his official capacity. He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

17.    Defendant, Jennifer Gates, is an officer of the City of Dallas and is being sued in his official capacity.  He may be served by serving the Office of the City Council.  *See* Fed. R. Civ. P. 4(j)(2)(A).

18.    Defendant, Philip Kingston, is an officer of the City of Dallas and is being sued in his official capacity.  He may be served by serving the Office of the City Council.  *See* Fed. R. Civ. P. 4(j)(2)(A).

## B.  JURISDICTION

19.    The Court has jurisdiction over the lawsuit, because the suit arises under Amendments I and XIV, Sec. 1, of the U.S. Constitution. "Congress shall make no law . . . abridging the freedom of speech.". . . "Nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." 28 U.S.C. § 1331.  *Gunn v. Minton*, 133 S.Ct. 1059, 1064 (2013); *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005).

20.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiffs' claims for title to Confederate Cemetery and Pioneer Park Cemetery, because plaintiffs' claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.  The threat of the removal of the Confederate Monuments gives rise to the abridgment of the constitutional guarantee of free speech and trespass to land.  Since the state

claims and the federal claim arise from the same nucleus of facts, the threatened removal of the Monuments, supplemental jurisdiction over the state claims is proper. *Exxon Mobil*, 545 U.S. at 558; *see City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 167 (1997).

21.    This action is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, which provides redress to persons who have been deprived of their civil rights under color of state law, and under 28 U.S.C. § 1343(a)(3)(4) and § 1331. These provisions confer jurisdiction on this Court to adjudicate violations of federal civil-rights acts and applicable provisions of the U.S. Constitution.

22.    The Court has authority to grant declaratory relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Remedies are available under 42 U.S.C. § 1983.

23.    The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1338, because the suit arises under 17 U.S.C. §§ 106(a)(2), 106(a)(3)(A)(B). Alexander Phimister Proctor was the sculptor of the Lee and Young Soldier Monument in Lee Park. When the City removed the Monument, it separated the pedestal from the bronze monument that had been one integral design of the sculptor and had been intended to remain in perpetuity. The City intentionally and with gross negligence destroyed and mutilated an artistic work of recognized international stature, thereby, infringing the sculptor's estate's copyright.

## C. VENUE

24.    Venue is proper in this district under 28 U.S.C. § 1391(B)(2), because all of the events or omissions giving rise to this claim occurred in this district and because all of the property at issue is situated in this district. The Confederate Monuments in Dallas are located in this district, and defendants' actions occurred and will occur in this district. Venue also lies under 28 U.S.C. § 1400(a), because defendants reside or may be found in this district.

## D. FACTS

25.    On April 6, 1857, Tannehill Lodge No. 52 of the Ancient Free and Accepted Masons and Dallas Lodge No. 44 of the Independent Order of Odd Fellows accepted title to the tract of land of Pioneer Park Cemetery in downtown Dallas. Exhibit A. On October 5, 1951, Tannehill Lodge No. 52 and Dallas Lodge No. 44 granted title to the land of today's Pioneer Park Cemetery to the City of Dallas to be used as a "memorial cemetery park, and should the City of Dallas, Texas, fail or refuse to use said property for such purpose, then title to the same shall revert to the Grantors herein, their heirs, successor or assigns." Exhibit A.

26.    In 1896, the Confederate War Memorial was dedicated in Old City Park.    *Confederate War Memorial (Dallas)*, WIKIPEDIA.ORG, https://en.wikipedia.org/wiki/Confederate_War_Memorial_(Dallas)    (last

visited September 12, 2017).  In 1961, the Confederate War Memorial was moved to Pioneer Park Cemetery to make way for a freeway.  *Id.*

27.    In 1901, J.A. Crawford purchased six acres of land adjacent to Oakland Cemetery in Dallas County.    *Questions and Answers*, DALLASCULTURE.ORG,  http://s3-us-east-2.amazonaws.com/oca-media/wp-content/uploads/2017/09/07161111/QA-2017.09.06.pdf, at 7 and Attachment E.  In 1907, the Dallas County Commissioners Court set aside .75 acres of the Crawford tract for the burial of ex-Confederate soldiers "under the direction and control of the Sterling Price Camp No. 31.[1]"  *Id.*  In 1936, the Sterling Price Camp gave the cemetery to the Dallas Parks and Recreation Department.  *Id.*  However, no record exists that the Camp ever delivered title to the City.  *Id.*

28.    Alexander Phimister Proctor, a U.S. citizen, created an original sculpture of Lee and Young Soldier, located for the last seventy-nine years in Lee Park up to yesterday.  Since the date of copyright creation by the installation of the sculpture with its base to create the Lee Monument, Proctor or his estate has been the sole proprietor of all rights, title, and interest in and to the copyright on the Lee Monument.  On June 12, 1936, Lee Park and the equestrian memorial to Robert E. Lee and Confederate soldiers were dedicated by President Franklin Roosevelt.  *Dedication of the Lee Memorial:  An Heroic Statue in Bronze Erected in Lee Park Dallas,*

---

[1]  Sterling Price Camp was the Dallas unit of the United Confederate Veterans; their successor association is the Sons of Confederate Veterans, the associational plaintiff in this matter.

*Texas,* DALLASCULTURE.ORG,

http://dallasculture.org/confederatemonuments/ (last visited September 12,

2017). The Lee and Young Soldier Monument was designed and sculpted by

Alexander Phimister Proctor, one of the foremost artists of his time and today

still remembered as a master sculptor. *The Lee Memorial: A Record of the*

*Ceremony of Unveiling,* DALLASCULTURE.ORG, http://s3-us-east-

2.amazonaws.com/oca-media/wp-content/uploads/2017/09/08083129/Lee-

Memorial-Dedication-Program.pdf, (last visited September 13, 2017). The

City finally removed the Lee Monument on September 14, 2017, damaging

and mutilating the work of art by prying it off its base and breaking bolts and

internal armature supports.[2]

29. On June 6, 1936, the Texas Centennial Exhibition opened at

Fair Park. *Texas Centennial Exposition,* WIKIPEDIA.ORG,

https://en.wikipedia.org/wiki/Texas_Centennial_Exposition (last visited

September 12, 2017). Fair Park is the only intact, pre-1950 world's fair site

in the United States and is an extraordinary collection of 1930s art deco

architecture and art. *Fair Park Has One of the World's Largest Collections of*

---

[2] At about 6 p.m., Thursday, September 14, 2017, plaintiffs' counsel David Vandenberg
received a phone call from Eric Radwick, Assistant Special Agent in Charge, Office of the
Inspector General, US General Services Administration. Mr. Radwick was aware of the Lee
Statue removal. The GSA, as the successor agency of the WPA that paid for the pedestal,
park improvements and part of Arlington Hall in Lee Park, was seeking contract information
for the Lee Monument and asking Attorney Vandenberg to assist in locating such documents.
The GSA is considering asserting a reversionary property interest in the base and pedestal to
the Lee Monument, portions of Lee Park, and Arlington Hall that the GSA may have, as was
common in WPA projects. The GSA is support documentation to support its case. Mr.
Radwick offered that he would be available to speak to Judge Fitzwater, if the Judge desired.
Mr. Radwick's cell phone is (202) 236-6340.

*Art      Deco      Art      and      Architecture,*      FAIRPARK.ORG,
https://fairpark.org/index.php/en/about-fair-park (last visited September 12,
2017). Fair Park includes the first recognition of African-American culture at
a world's fair, the Hall of Negro Life. *Texas Centennial Exposition,*
WIKIPEDIA.ORG,
https://en.wikipedia.org/wiki/Texas_Centennial_Exposition      (last      visited
September 12, 2017). Fair Park was designated a National Historic
Landmark in 1986 and is protected under federal law. *Id.*

30.      The Dallas City Council voted to remove the Lee statue on
Wednesday, September 4, 2017, and made numerous attempts to remove the
statue. *Crane on Way to Remove Robert E. Lee Statue in Deadly Crash in
Dallas,* CBSNEWS.COM (September 11, 2017, 8:21 a.m.),
https://www.cbsnews.com/news/crane-on-way-to-remove-robert-e-lee-statue-
deadly-crash-dallas/.

31.      The City-Council Resolution under No. 5 directs the city
manager to immediately remove the Robert E. Lee Monument, and under No.
6, the Resolution directs the city manager to transfer funds to remove all
public Confederate monuments. Dallas City Secretary, City Council Briefing
Meeting      (September      6,      2017),
http://citysecretary2.dallascityhall.com/pdf/CC2017/090617AG.pdf.

32.      On September 7, 2017, the Mayor's Task force on Confederate
Monuments issued its "Questions and Responses." http://s3-us-east-

2.amazonaws.com/oca-media/wp-content/uploads/2017/09/07161415/2017-09-07-Briefing-on-Historical-Context-of-Confederate-Monuments.pdf. **The Task Force also issued its "Presentation to the Task Force on Confederate Monuments."** http://s3-us-east-2.amazonaws.com/oca-media/wp-content/uploads/2017/09/01103951/Meeting-2017-08-31Public-Art-Overview-and-Policies.pdf. The City's purpose in issuing these materials is to study the removal of Confederate symbols from Dallas, including Lee Park, Pioneer Park, Confederate Cemetery, and Fair Park, a federally protected art and architectural artifact of national significance. *Id.*

## COUNT 1 – THE CITY HAS BREACHED PLAINTIFF ASSOCIATION'S COPYRIGHT INTEREST IN THE LEE AND YOUNG SOLDIER MONUMENT BY REMOVING THE MONUMENT FROM THE PLACE THAT THE CITY AGREED TO DISPLAY THE MONUMENT AND BY DAMAGING THE MONUMENT IN ITS REMOVAL.

33.     Alexander Phimister Proctor and his estate have complied in all respects with the Copyright Act, 17 U.S.C. § 101 et seq., and with all other laws governing copyrights.

34.     Alexander Phimister Proctor's Lee and Young Soldier Monument is copyrightable subject matter under the laws of the United States.

35.     Defendants willfully infringed the Proctor Estate's copyrighted work.

36.     Laura Ames, Co-Director of the Proctor Estate, called the Dallas Mayor's Office, the City Manager's Office, and at least some City Council

Members' Offices to contest the imminent removal of the Lee Monument over a period of weeks before the removal.  Ms. Ames had a short conversation with Jennifer Scripps, Director of the Office of Cultural Affairs on the Estate's concerns about damage the Lee Statue.  Ms. Scripps never called Ms. Ames back.

## COUNT 2 - ABRIDGEMENT OF FREE SPEECH

37.    A bedrock principle of the First Amendment is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); **U.S. Const.** amend. I.; *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 577 (1991) ("Where the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional.") (Scalia J., concurring).

38.    A significant exception to the right to free speech is found in the government-speech doctrine. *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460, 460 (2009).  Here, the court held that a government actor "is entitled to say what it wishes and to select the views that it wants to express." *Id.* "The placement of a permanent monument in a public park is a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause." *Id.*   The government-speech doctrine is an absolute defense to First Amendment challenges, and an unwise one at that. *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 571 (2005) (Souter, J.,

dissenting).   Unchecked expansion of the government-speech doctrine threatens to erode constitutional protections by allowing viewpoint discrimination in an increasingly wide range. *Developments in the Law— State Action and the Public/Private Distinction*, 123 HARV. L. REV. 1248, 1293 (2010).

39.   One significant area of exemption from the government-speech doctrine is where government funds speech through subsidies in order to promote diversity.[3] The U.S. Supreme Court in its first government-speech case took pains to acknowledge that the government may not discriminate against government-subsidized activities solely on the basis of viewpoint. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

40.   In like manner, the government cannot make viewpoint restrictions of speech, even in unprotected forms of speech, such as libel. *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 383-84 (1992).

> [T]hese areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content. Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.

*R.A.V.*, 505 U.S. at 383-84.

---

[3] Another exemption, the Establishment-Clause exemption, is discussed in some detail in *Summum*. 555 U.S. at 460; *see* Scalia concurrence. *See also R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, FN 4 (1992). This exemption is not in controversy in this matter.

> That would mean that a city council could enact an ordinance
> prohibiting only those legally obscene works that contain
> criticism of the city government or, indeed, that do not include
> endorsement of the city government. Such a simplistic, all-or-
> nothing approach to First Amendment protection is at odds with
> common sense and with our jurisprudence as well.

*R.A.V.*, 505 U.S. at 384.[4]

41.    The prohibition against viewpoint discrimination holds true for

government speech in a limited public forum. *Rosenberger v. Rector &*

*Visitors of the University of Virginia*, 515 U.S. 819, 833 (1995). "[W]hen the

State is the speaker, it may make content-based choices. . . .  We recognized

that when the government appropriates public funds to promote a particular

policy of its own it is entitled to say what it wishes." *Id.* "It does not follow,

however, and we did not suggest in *Widmar*, that viewpoint-based

restrictions are proper when the University does not itself speak or subsidize

transmittal of a message it favors but instead expends funds to encourage a

diversity of views from private speakers." *Id.* at 834.

> [W]e reaffirmed the requirement of viewpoint neutrality in the
> Government's provision of financial benefits by observing that
> "[t]he case would be different if Congress were to discriminate
> invidiously in its subsidies in such a way as to "aim at the
> suppression of dangerous ideas." (citations omitted).

*Rosenberger*, 515 U.S. at 834. In other words, when the government provides

subsidies to support diversity of viewpoint, the government must maintain

viewpoint neutrality in the provision of such subsidies.

---

[4] Justice White asserts that the prohibition against government burdening of speech content
critical of government is not a First Amendment consequence, but rather a consequence of
the Equal Protection Clause. *R.A.V.*, 505 U.S. FN 4.

42. The prohibition on viewpoint discrimination serves to bar the government from skewing public debate. *Id.* at 894. (Souter, J., dissenting). "It is precisely this element of taking sides in a public debate that identifies viewpoint discrimination and makes it the most pernicious of all distinctions based on content." *Id.* at 895.

43. The *Rosenberger* court concerns itself with the prohibition of viewpoint discrimination in government speech in a limited public forum. *Id.* at 819. *National Endowment of Arts v. Finley* inquires into the prohibition of viewpoint discrimination in government speech in a government forum. 524 U.S. 569 (1998).[5]

44. A government actor in a government forum, such as the National Endowment for the Arts (NEA), may not leverage its power to award subsidies by subjective criteria to penalize disfavored viewpoints. *Id.* at 587-88. Indeed, works of art are unquestionably shielded by First Amendment protection. *Id.* at 602. (Souter, J., dissenting).

> The constitutional protection of artistic works turns not on the political significance that may be attributable to such productions, though they may indeed comment on the political, but simply on their expressive character, which falls within a spectrum of protected speech extending outward from the core of overtly political declarations. Put differently, art is entitled to full protections because our "cultural life," just like our native politics, "rest upon [the] ideal" of governmental viewpoint neutrality.

---

[5] *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460 (2009) does not inquire into subsidies in relation to government speech, nor into the requirement that the government many not provide subsidies to promote diversity of viewpoint in any forum and exercise viewpoint discrimination.

*National Endowment for the Arts*, 524 U.S. at 602-03.

45.   Government may not discriminate on viewpoint, when government expends funds to encourage a diversity of view from private speakers.  *Id.* at 613.  (quoting *Rosenberger*, 515 U.S. at 834).  "When the government acts as patron, subsidizing expression of others, it may not prefer one lawfully stated view over another."  *Id.*

> So long as Congress chooses to subsidize expressive endeavors at large, it has no business requiring the NEA to turn down funding applications of artists and exhibitors who devote their "freedom of thought, imagination, and inquiry" to defying our tastes, our beliefs, or our values.  It may not use the NEA's purse to "suppress dangerous ideas."

*National Endowment for the Arts*, 524 U.S. at 613-14. (quoting *Regan v. Taxation with Representation for Wash.*, 461 U.S. 540, 548 (1983)).

46.   The City of Dallas, Office of Cultural Affairs, (OCA) oversees the City's public art collection.  *Public Art*, DALLASCULTURE.ORG, http://dallasculture.org/publicart/ (last visited September 14, 2017).   The Mayor's Task Force on Confederate Monuments convenes under the auspices of the OCA.  *Questions and Answers.*  The City has thus recognized that the Confederate Monuments are foremost works of art.

47.   The City has acknowledged that diversity is an essential factor in the consideration of its public art collection.  The COA's public art project mission statement states that "A city with public art values and invests in its diversity, identity, and future."   *Public Artist Handbook*, DALLASCULTURE.ORG at 3, http://dallasculture.org/wp-

content/uploads/2017/03/Public-Artist-Handbook.pdf (last viewed September

13, 2017). The criteria for the acquisition of new public art are "the quality of

design, appropriate of location, durability, ease of maintenance, safety, and

diversity. *Public Art,* DALLASCULTURE.ORG,

http://dallasculture.org/publicart/ (last viewed September 13, 2017).

48.   The City's public art program, that includes the Confederate

Monuments, uses diversity as a primary standard for the acquisition of new

works and for the maintenance of existing one.   The City subsidizes

acquisitions with grants and existing works with maintenance.   These

subsidies are made for the express purpose of supporting diversity.

49.   City Councilmen have made public statements criticizing the

Confederate Monuments political viewpoints that the councilmen attribute to

the monuments and that the councilmen disfavor and find repugnant.   On

August 28, 2007, three city councilmen, Dwaine R. Caraway, Cory Thomas,

II, and Tennell Atkins, entered a resolution for consideration by the full

council on September.   *A Resolution of the City of Dallas Regarding*

*Confederate Figures and Symbols,* DALLASCITYHALL.COM,

http://dallascityhall.com/government/Council%20Meeting%20Documents/Age

nda_090617.pdf (last viewed September 13, 2017).   The purpose of the

resolution was to remove the Lee and Young Soldier Monument immediately

and to order the removal of all other Confederate Monuments. *Id.* The

councilmen stated that their sole basis for the removal of the monuments was

the political viewpoints that the councilmen attributed to the monuments.

*Id.*

> **WHEREAS**, the Confederacy lost its war against the United States and the "negro" slave was then freed from slavery, transferring names from "negro" to "colored[;]"
>
> **WHEREAS,** "colored" individuals continued to face discriminatory laws, legal practice, and punished violence specifically aimed at preventing them from achieving equality from Reconstruction through the Jim Crow era; . . .
>
> **WHEREAS,** Confederate monuments, along with public places, including parks[] and streets are named for prominent Confederates continue to be glaring symbols of our country's division[] and create racial barriers in our city . . . .

*A Resolution of the City of Dallas Regarding Confederate Figures and Symbols.*

50.    The City is exercising viewpoint discrimination against works of art, because the City has attributed disfavored political messages to the Monuments and now is attempting to remove the Monuments based solely on the political viewpoints that the City alleges the Monuments communicate.  Indeed, the dedicatory brochure of the Lee and Young Soldier Monument makes no mention of the political attributes that the Dallas Councilmen say the Monument communicates.  President Roosevelt said in his dedicatory remarks that Robert E. Lee was "one of the greatest American Christians and one of our greatest American gentlemen." *The Lee Memorial.*

51.    The First Amendment presumptively restrains viewpoint discrimination by a state actor. *National Endowment*, 524 U.S. at 616;

*Simon & Schuster, Inc. v. Members of New York State Crime Victim Bd.*, 502 U.S. 105, 116 (1991).  Since the presumption favors First-Amendment rights, the City has the burden to explain how these Monuments communicate these imputed messages that are so remote from the Monument founders' published statements.  *National Endowment*, 524 U.S. at 616.

52.    But even if the Dallas Councilmen are correct in their understanding as to the dangerous political messages that emanate from these works of public art, the City is prohibited from disfavoring or impairing minority political viewpoints that they have subsidized and called forth through the City's invitation for diversity in art projects.  *Id.* at 613-14; *see also Regan,* 461 U.S. at 548.  The core constitutional issue as to why a state actor may not favor political viewpoints when the actor has subsidized and requested a diversity of viewpoints is that the state has opened the door to political discussion and cannot thereafter favor or disfavor one political viewpoint over another.  Indeed, the state must protect dangerous or dissenting viewpoints, especially in works of art that state actors subsidize to express disfavored and outrageous viewpoints.  *Id.*  The unchecked expansion of the government-speech doctrine into the realm of public art expressly subsidized to project diversity of expression and viewpoint chills free speech when the state actor picks which

viewpoints it will tolerate and which not. The Court should disallow this unchecked and unconstitutional expansion of government-speech into state-subsidized fora requesting diverse viewpoints and in public works of art in order to prevent government control of traditional areas of free thought and expression.

## COUNT 3 – THE CITY HAS BREACHED THE REVERSIONARY TERM IN THE GRANT OF TITLE IN PIONEER PARK CEMETERY, AND TITLE NOW RESIDES IN THE LODGES.

53.    The City of Dallas took title to Pioneer Park Cemetery from Tannehill Lodge No. 52 and Dallas Lodge No. 44 (the Lodges) with the understanding that the City would "use and maintain" the property as a "Memorial Cemetery Park." Exhibit A at 1. If at any time the City would "fail or refuse to use said property for such purpose, then title to the same shall revert to the Grantors herein, their heirs, successors or assigns." *Id.* at 3.

> The City of Dallas, as Grantee herein, shall maintain the property as a Memorial Cemetery Park by mowing the grass, trimming the hedges, shrubbery and trees. The City shall have no duty to maintain the headstones, markers or tombstones, but the same will be permitted to stand as they are now; nor, will the City be obligated to rebuild any of the private grave enclosures or fences that may now exist on the premises.

Exhibit A at 3.

54.    The grant terms require the City to perform maintenance on the existing property but not on any of the memorial objects on the property, the fences, enclosures, headstones, tombstones, or other markers of the dead or

grave boundaries.  Moreover, the grant does not allow the City to remove or add headstones or markers, but only to maintain the grass, hedges, shrubbery, and trees.

55.    The City has publicly announced that it will remove the Confederate War Memorial in Pioneer Park Cemetery.    Dallas City Secretary, City Council Brief Meeting (September 6, 2017), http://citysecretary2.dallascityhall.com/pdf/CC2017/090617AG.pdf.        The City's repudiation of the Confederate War Memorial and dedication of funds to remove the Memorial is a refusal and failure to use the memorial park for the purpose mandated in the transfer of title to the City.  Because the City has refused its duty to maintain and use Pioneer Park Cemetery as agreed in accepting title, title must revert to the Lodges.

### COUNT 4 –TITLE TO THE CONFEDERATE CEMETARY RESIDES IN THE SONS OF CONFEDERATE VETERANS, BECAUSE TITLE WAS NEVER DELIVERED AND THE CITY HAS NOT EXERCISED POSSESSION OF THE PROPERTY.

56.    The Mayor's Task Force on Confederate Monuments has published title in the Confederate Cemetery in the United Confederate Veterans.[6] *Questions and Answers*, DALLASCULTURE.ORG, http://s3-us-east-2.amazonaws.com/oca-media/wp-content/uploads/2017/09/07161111/QA-2017.09.06.pdf, at Attachment E.  The City alleges that the Sterling Price Camp of the United Confederate Veterans gave the Confederate Cemetery to the Dallas Parks and Recreation Department in 1936.  *Id.* at 7.  However, the

---

[6] Associational plaintiff, Sons of Confederate Veterans, is the successor association to the United Confederate Veterans.

City admits that no record exists of conveyance of title. *Id.*

57.     It is settled law that title to transferred property vests upon execution and delivery of a deed. *Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex. 1974). Delivery is established when the deed comes under the grantee's control with the grantor's intent to convey the deed and to relinquish control of the deed to the grantee. *Hicks v. Loveless*, 714 S.W.2d 30, 32 (Tex. App. — Dallas 1986, pet. denied). The City admits that it has no legal records of conveyance and no record of title. *Questions* at 7. Absent documents of delivery and acceptance, title should reside with the grantor, the Sons of Confederate Veterans.

58.     Members of the Sons of Confederate Veterans have been regularly caring for the Confederate Cemetery and the graves of their ancestors for at least three years, subsequent to their observation that the cemetery appeared abandoned. SCV members have removed fallen trees and limbs, re-erected headstones, searched for, found, and re-sited buried headstones, re-erected the large Confederate Memorial in the cemetery that had fallen, and repaired the damaged the chain-link fence around the cemetery. Prior to this caretaking, basic park maintenance had remained apparently absent for decades.

59.     City title search has revealed that title rests in the Sons of Confederate Veterans and that an alleged conveyance of the cemetery never occurred. Moreover, even if the City believed it had title to the cemetery,

markers, large memorial, and grounds languished under the City's oversight. The City's own title search in favor of the SCV and evident abandonment of the cemetery, followed by restoration by the SCV, should rest title in fee simple squarely in the SCV.

## E. REQUEST FOR PRELIMINARY INJUNCTION

60.     Plaintiffs have sued defendants for violation of copyright, the right to free speech, to quiet title in Pioneer Park Cemetery, and to quiet title in Confederate Cemetery.

61.     Plaintiffs will likely suffer irreparable injury, if defendants are not restrained from removing or further damaging the Lee and Young Soldier Monument in Lee Park from its current location, if the Court does not enjoin defendants do not allow plaintiffs and plaintiffs' agents to inspect the Lee Statue for damage, and the Court does not enjoin defendants from removing, altering, or concealing the other Confederate monuments in the City of Dallas, because further damage or removal or obscuration would impair plaintiffs' right to enjoy the disfavored political speech embodied in the Monument, as well as enjoy the artistic brilliance that the monuments communicate. Plaintiffs ask for a preliminary injunction for the pendency of this suit. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008); *Celsis In Vitro, Inc. v. CellzDirect, Inc.,* 664 F.3d 922, 930 (Fed. Cir. 2009). "The loss of First Amendment interests were either threatened or in fact being impaired at the time relief was sought.   The loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

62.     There is a substantial likelihood that the plaintiffs will prevail on the merits. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). The City has already and is planning further to abridge the political speech of the Confederate Monuments and attempt to substitute its own government-controlled viewpoint of the Monuments' political and artistic communication. Case law on this issue clearly supports the constitutional guarantee that government actors may not force their own viewpoint on plaintiffs where the government has subsidized a public-art forum for diversity of political messages. In addition, the claims for title, arising from the title documents, is on all fours to support plaintiffs' claims to title. Plaintiffs' copyright claim has a substantial likelihood of prevailing, because the Proctor Estate has copyright, has orally agreed to assignment of title to the SCV,[7] and defendants have infringed copyright by damaging the Lee and Young Soldier Monument, as well as removing the Monument from permanent public display in Lee Park.

63.     There is no adequate remedy at law, because any legal remedy would be merely illusory. *Northern Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984). The denial of free speech by removal or concealment of the Monuments cannot be readily reduced to monetary

---

[7] The Sons of Confederate Veterans and the Proctor Estate are negotiating a written assignment of the Estate's copyright interest to the SCV.

damages. The only adequate remedy to the abridgment of free speech is the injunctive demand to protect the abridged free speech and to provide the denied due process. The City's removal of the Lee Monument from public display is a continuing breach of copyright that cannot be readily ascertained via monetary compensation. The only remedy is the return of the Monument to its plinth in Lee Park.

64.     The harm to plaintiffs outweighs the harm that a temporary injunction order would inflict on defendants. *Winter*, 555 U.S. at 24; *Yakus v. United States*, 321 U.S. 414, 440 (1944). Plaintiffs will experience irreparable harm by the continuing denial of political viewpoint and infringement of copyright communicated by the Monuments, as well as trespass to land. *Elrod*, 427 U.S. at 373. Defendant will suffer no definable harm by allowing the Monuments to stand and from being restrained from entering land as a trespassor.

65.     Issuance of a preliminary injunction would not adversely effect the public interest and public policy, because issuance of the order would serve the public interest. *See Winter*, 555 U.S. at 24-26; *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362-63 (Fed. Cir. 2008). Indeed, the benefit to third parties would be inestimable, as the continued non-abridgment of political viewpoint cannot be undervalued. Indeed, the order would mark the end of the proposed Orwellian terror that the City is planning to inflict on the public. The Court's injunction against the City's plan to control political

*Plaintiffs' Second Amended Complaint and Request for Injunctive Relief*
Page 24 of 29

speech will reinforce basic constitutional guarantees in Dallas that the City would gladly abridge.  If there is one principle that the Civil War and the Ku Klux Klan Act resolved it was that federal constitutional protections cannot be ignored by local authorities.  The affirmation of this principle will serve the public interest.

66.    Plaintiffs are willing to post a bond in the amount the Court deems appropriate.  However, plaintiffs are filing this cause in the public interest and request that the Court order no or a nominal bond.  *Kaepa, Inc., v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).  Firstly, defendant stands in no financial risk by the issuance of the requested injunction.    And secondly, plaintiffs are suing in the public interest and stand to recover no damages in this action.

67.    Plaintiffs ask the Court to set the request for a preliminary injunction hearing at the earliest possible time, and, after hearing the request, to issue a preliminary injunction against defendant.

## F.  CONCLUSION

68.    Plaintiffs have proper jurisdiction and venue to appear before the Court and request injunctive relief.   The City has already abridged plaintiffs' free speech by removing the Lee Monument and physically damaging the Lee and Young Soldier Statue.  Plaintiffs will suffer further constitutional harm by the removal of the political speech expressed in the Monuments.  Plaintiffs have serious concerns that the City's totalitarian

agenda of control of political speech in public art subsidized to present diversity of expression will succeed without intervention of this Court. For these reasons, plaintiffs ask the Court to issue a preliminary injunction, preventing defendants from removing the Confederate Monuments and securing the Lee and Young Soldier from further damage, loss, and destruction.

## G.  DAMAGES

69.    As a direct and proximate result of defendant's conduct, plaintiff suffered the following damages:

      a.    Actual damages to the Lee and Young Soldier Statue.

## H.  ATTORNEYS' FEES AND COSTS

70.    Plaintiffs are entitled to an award of attorney fees and costs under 17 U.S.C. § 505.

## I.  PRAYER

71.    For these reasons, plaintiffs ask that the Court do the following:

      a.    Enter a preliminary junction against defendants that they may not remove, obscure, alter, or destroy the Confederate Monuments in Lee Park, Pioneer Plaza Cemetery, Confederate Cemetery, or any other location, to include Proctor's statue of Lee and Young Soldier for the pendency of this suit;

b.     Enter a declaratory judgment that defendants' actions, past and present, have violated plaintiffs' constitutional rights, guaranteed in the First Amendment to the U.S. Constitution;

c.     Enter a declaratory judgment that defendants' actions have infringed plaintiffs' copyright in Proctor's Lee and Young Soldier Statue;

d.     Enter specific performance against defendants that defendants must repair and replace Proctor's Lee and Young Soldier Statue to its original and perpetual site in Lee Park;

e.     Enter a permanent injunction against defendants that defendants must maintain and retain the Confederate Monuments, already in their possession and as agreed upon in several written agreements and by virtue of estoppel, in their original locations and in perpetuity;

f.     Enter judgment that quiets title to Pioneer Cemetery Park in favor of plaintiffs;

g.     Enter judgment that quiets title to the Confederate Cemetery in favor of plaintiffs;

h.     Award reasonable attorney fees to plaintiffs;

i.     Award costs of suit to plaintiffs; and,

j.      Grant any other relief the Court deems appropriate.

September 15, 2017

Respectfully submitted,

/s/ KIRK DAVID LYONS                    /s/ David D. Vandenberg
Texas Bar No. 12743500                  Mo. Bar No. 69873
P.O. Box 1235                           Admitted to No. Dist. Tex.
Black Mountain, N.C. 28711              3603D Las Colinas Drive
E-mail kdl@slrc-csa.org                 Austin, Texas 78731
Tel. (828) 669-5189                     davidvandenberg@hotmail.com
Fax (828) 669-5191                      Tel. (512) 373-8694

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS,
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| Hiram Patterson, Texas Division, | § | |
| Sons of Confederate Veterans, Inc., | § | |
| Plaintiffs, | § | |
|  | § | |
| v. | § | |
|  | § | |
| Mike Rawlings, | § | |
| In His Official Capacity as | § | |
| Mayor of the City of Dallas, and | § | Civil Action No. 3:17 -cv- 02361-SF |
| Scott Griggs, Adam Medrano, | § | |
| Casey Thomas, II, Dwaine Caraway, | § | |
| Rickey Callahan, Omar Narvaez, | § | |
| Kevin Felder, Tennell Atkins, | § | |
| Mark Clayton, Adam McGough, | § | |
| Lee Kleinman, Sandy Greyson, | § | |
| Jennifer Gates, Philip Kingston, | § | |
| In Their Official Capacities as | § | |
| Members of the Dallas | § | |
| City Council, | § | |
| Defendants. | § | |

## AFFIDAVIT of KIRK DAVID LYONS

STATE OF NORTH CAROLINA §
                        §
BUNCOMBE COUNTY         §


## AFFIDAVIT OF KIRK DAVID LYONS

Before me, the undersigned notary, on this day personally appeared Kirk David Lyons, affiant, a person whose identity is

known to me.  After I administered an oath, affiant testified as
follows:

      1.    "My name is Kirk David Lyons.  I am competent to
make this affidavit.  The facts stated in this amended complaint
are within my personal knowledge and are true and correct.

      2.    I have been reading news articles, talking with
witnesses, and reading statements made by the parties in this
matter."

_____

KIRK DAVID LYONS

SWORN TO and SUBSCRIBED before me by Kirk David
Lyons on September 15, 2017.

Lynette M. Mills, Notary
Lynette m. mills
My Commission Expires:
04/30/2021